ROBERT L. TRAIN, Respondent, v. THE ATCHISON, TOPEKA and SANTA FE RAILWAY COMPANY, et al., Appellants.

In the Kansas City Court of Appeals, April 2, 1923.

1. WAREHOUSEMEN: Jury Held Justified in Finding That Lighted Lantern was Cause of Fire Which Destroyed Automobile Loaded for Shipment by Employees of Warehouseman. Evidence *held* sufficient to justify jury in finding that a fire in a freight car, which destroyed an automobile placed therein, by employees of a warehouse company, was caused by a lighted switchman's lantern taken into the car by them and set down in close proximity to automobiles from which gasoline was being drained by them.

2. EVIDENCE: Common Knowledge: Inflammable and Volatile Nature of Gasoline and Tendency of its Vendor to Spread to Nearby Open Flame and Ignite, are Matters of Common Knowledge. The inflammable and volatile nature of gasoline whereby its vapor is given off, and the tendency of the latter to spread to nearby open flame and ignite, are matters of such common knowledge that any ordinary mind should apprehend the danger, and the jury could reasonably find that it was negligent to bring a lighted lantern into a car where gasoline was being drained in close proximity thereto.

3. WAREHOUSEMEN: Carriers: Negligence: Warehouseman and Railway Company Both Held Liable for What Their Servants Negligently Did in Preparing Automobiles for Shipment, Regardless of Whether Warehouse Company Had Partially or Entirely Relinquished Shipment to Custody of Railway Company. If the servants of both defendants, a railway company and a warehouse company, acting within the scope of their employment, entered a freight car for the purpose of preparing automobiles for shipment by draining gasoline therefrom, and negligently brought a lighted lantern into the car and undertook to drain gasoline, with said lantern in close proximity thereto, then both defendants would be liable for the loss of automobiles destroyed by fire, without regard to whether the warehouse company had partially or entirely relinquished the shipment to the custody of the railway company, each defendant being liable for what its servants negligently did.

4. ———: ———: Bailor and Bailee: Negligence: Shipper Cannot Recover for Loss of Automobile by Fire Against Railway Company, if the Loss was Caused by Shipper's Agent, a Bailee, Who Delivered

the Automobile to Railway Company for Shipment, Unless the Railway Company Negligently Participated in the Act Causing the Loss. Where an automobile was delivered to a warehouse company for shipment, the shipper may sue the railway company to which warehouse company delivered the automobile, for loss thereof by fire which destroyed the same after it was loaded into a freight car, though the warehouse company was the shipper's agent, and not bailee, as between the shipper and the railway company, even if the bill of lading was in the name of warehouse company, since it was a contract made for his benefit, but the shipper could not recover against the railway company if the loss was caused by the negligence of shipper's agent, unless the railway company also negligently participated in the act causing the loss.

5. ————: ————: Negligence: Railway Company Held not Liable for Shipment of Automobile Negligently Destroyed by Fire as Result of Acts of Warehouse Company's Employees. Where a railway company did not have anything to do with loading an automobile into a freight car or preparing it for shipment, except to inspect and approve the manner of its fastening in the car, *held* not liable for the resulting loss thereof by fire caused by the negligence of the servants of a warehouse company in negligently draining gasoline therefrom in close proximity to a lighted lantern, though railway company did not require automobiles to be drained as a preparation for shipment, issued a bill of lading which had been signed, and one of its employees got a can and was willing and expected to receive for his personal use some of the gasoline.

6. APPEAL AND ERROR: Where There is Sufficient Evidence to Support a Verdict, the Appellate Court Cannot Interfere. Where there is evidence sufficient to support a verdict, the appellate court cannot interfere, as it is not a question as to what the appellate court might find if it were sitting as triers of the facts.

7. WAREHOUSEMAN: Master and Servant: Respondeat Superior: Master Liable for Negligence of Employees in Line of Employment While Seeking to Accomplish Master's Work, Though Particular Act was not Ordered or Intended by Master to be Done. Warehouse company *held* liable for negligent acts of its employees in setting fire to automobiles while draining gasoline therefrom, after loading the same into a freight car for shipment, even though the particular act in draining them was not ordered or intended by it to be done, and they intended to sell the gasoline and appropriate the proceeds to their own use, if they were acting upon the idea that it was a part of the proper preparation of the automobiles for shipment and of their work in so doing.

8. ———: ———: Scope of Employment: Evidence Held Sufficient to Justify, Jury in Finding that Employees of Warehouse Company in Removing Gasoline from Automobiles Destroyed by Fire Were Seeking to Accomplish Master's Work and Acting Within Scope of Their Employment. Evidence *held* sufficient for jury to find that employees of warehouse company in removing gasoline from automobiles which were destroyed by fire as a result of their negligent acts, were seeking to accomplish the work of their master and acting within the scope of their employment.

9. ———: ———: ———: Pleading: Petition Held to State Cause of Action in Alleging that Negligent Acts of Employees of Warehouse Company Were Done Within Scope of Their Employment. Where petition alleged that plaintiff delivered an automobile to a warehouse company which accepted same and undertook to and did deliver it to a railway company for shipment, that defendants placed it in a freight car which they entered for the purpose of preparing it for shipment, and while draining gasoline therefrom, their servants while engaged in the business of defendants, and acting in the scope of their employment, negligently took a lighted lantern into the car, sufficiently stated a cause of action as against the contention that it alleged no facts showing that the warehouse company's employees were acting within the scope of their employment.

10. EVIDENCE: Pleading: Custom: Practice: Where Custom or Practice is not Relied upon as One of the Constitutive Elements of a Cause of Action, but Merely as Evidential Matter, it is Properly Admissible Though not Pleaded. Evidence as to custom or practice of warehouse company to remove gasoline from automobiles then shipped, was admissible though not pleaded, as bearing on the question of whether its employees in draining the gasoline were acting within the line of their employment; such custom or practice not being relied upon as one of the constitutive elements of the cause of action, but merely as an evidential matter.

11. INSTRUCTION: Where it was Conceded that Men Charged with Negligence were Defendant's Employees, an Instruction Referring to Them as Such was not Erroneous. Where it was conceded that employees of warehouse company charged with negligence were its employees, there was no error in an instruction referring to them as such.

12. ———: An Instruction Referring to Employees Charged with Negligence, as Defendant's Employees, Held not to Assume Such Fact or That They Were at the Time of Their Alleged Negligence Acting Within the Scope of Their Employment. An instruction by referring

to men who were employed by defendant, warehouse company, charged with negligence in setting fire to automobile, *held* not to assume that they were at the time of the fire acting as such employees within the scope of their employment, but as expressly submitting to the jury the question whether they were so acting or not.

13. ———: **Instruction Held not Erroneous Because it Did not Explain what Would Bring Particular Work Within Scope of Servant's Employment.** The charge that an instruction did not explain to the jury what would bring the work of draining gasoline from automobiles within the scope of servant's employment, *held* untenable since the instruction in submitting that issue required the jury to find that such draining was a part of the work of caring for and preparing the automobiles for shipment.

14. ———: **An Instruction Permitting Finding for Warehouse Company if Property Destroyed by Fire, Through Negligence of Its Servants, Had Been Delivered to Railway Company, was Properly Refused as Ignoring the Question as to the Negligence of the Servants of Warehouse Company.** An instruction offered by defendant, warehouse company, was properly refused because it ignored the question of whether the warehouse company, through its servants, negligently destroyed the automobiles by fire, and simply directed the jury to find a verdict for said defendant if the property had been delivered to the railway company.

15. **VERDICT: A Verdict Reciting That Jury Found Issues for Plaintiff and Assessed His Damages in a Certain Sum Against Both Defendants, Held not Defective.** In an action against a warehouse company and a railway company to recover damages for negligence, a verdict which recited that the jury found the issues for plaintiff and assessed his damages in a certain sum against both defendants, *held* not defective.

Appeal from the Circuit Court of Jackson County.— *Hon. Thos. B. Buckner,* Judge.

REVERSED as to Railway, AFFIRMED as to Warehouse Company.

*Hogsett & Boyle* for respondent.

*William G. Holt* and *J. K. Cubbison* for Warehouse Company.

*Cyrus Crane, Geo. J. Mersereau, John H. Lathrop* and *Winston H. Woodson* for Railway.

TRIMBLE, P. J.—Plaintiff's action is to recover for the loss of an automobile destroyed by fire. Verdict and judgment for $6475 were obtained against both defendants and they have appealed.

A part of the business of the defendant, A. B. C. Fireproof Warehouse Company, is to receive automobiles from individual owners and prepare and load such vehicles into collective carload shipments of three in a car when that many are desired to be sent to the same point. In doing this, the Warehouse Company does the work of preparing and loading the automobiles, the railway company having nothing to do in that respect. In such cases the Warehouse Company pays the freight on the carload, obtains the bill of lading from the railroad issued to the Warehouse Company as shipper, and the owner of each automobile pays to the Warehouse Company his proportionate part of the freight bill, plus an additional sum as compensation to the Warehouse Company for its services. In this way each owner is enabled to have his automobile transported at less expense than if he shipped it alone.

On October 26, 1920, the Warehouse Company received plaintiff's automobile for the purpose of loading and preparing it for transportation in a collective carload shipment, with two other automobiles, in a freight car over the Santa Fe Railway, from Kansas City, Missouri, to Los Angeles, California. The contract under which the automobile was received stated that its reception was for the purpose of forwarding it in the first collective carload consignment from Kansas City to Los Angeles, and that, in so doing, the Warehouse Company was acting "only as agent for the owner and not in the capacity of a common carrier;" that it was received for shipment subject to the terms and conditions of the uniform bill of lading issued by the railroad on whose line it was to be shipped; and that the responsibility of the Warehouse Company should "cease upon delivery of the goods to the Railroad Company in good condition."

The petition charged that plaintiff delivered said property to the Warehouse Company "to be forwarded from Kansas City, Missouri, to Los Angeles, California;" that the Warehouse Company "for hire, accepted said property and undertook to, and did, deliver the same to the defendant Atchison, Topeka and Santa Fe Railway Company at Kansas City, Missouri, to be carried by said Railway Company from Kansas City, Missouri, to Los Angeles, California;" that the railway company, as a common carrier for hire "accepted said property and undertook to carry" the same and to redeliver it to plaintiff or his agents at Los Angeles.

The petition then alleged that "defendants placed said property in an enclosed freight car of the defendant Railway Company at Kansas City, Missouri, along with other property including other automobiles and equipment;" that thereafter the "defendants, their agents and employees, entered said freight car for the purpose of preparing said property for shipment, and negligently carried a lighted lantern in said freight car, and negligently undertook to drain and remove the gasoline from one or more of the automobiles in said car while said lighted lantern was near by, when they knew or by the exercise of ordinary care should reasonably have anticipated that there was imminent danger of the said gasoline and the gas vapor and the fumes therefrom becoming ignited by the flame in said lantern, and imminent danger of a dangerous explosion and fire directly resulting therefrom which would cause damage to the property in said car including plaintiff's property;" that "while defendants and their agents and employees were in the act of draining and removing the gasoline from one or more of said automobiles with said lighted lantern near by, as aforesaid, said gasoline and the gas, vapor and fumes therefrom, became ignited by the flame in said lighted lantern," thereby directly causing a fire which totally destroyed the property; that the loss was "directly caused by the aforesaid negligence of the de-

fendants, their agents and employees;'' and that the aforesaid negligent acts of said agents and employees were performed by them ''while they were engaged in, upon, and about the business of the defendants, and within the line and scope of their respective authority and employment as the agents and employees of their respective defendants.''

The Warehouse Company set up the purpose and terms under which it received the automobile and alleged that it delivered said property to the railway company by loading it into the latter's freight car; that the railway company, after inspecting the shipment, received it, issued its bill of lading and undertook to carry said property to Los Angeles; that the property was burned while in the exclusive control and custody of the railway company without any negligence on the part of the Warehouse Company. It denied that any of its servants negligently undertook to drain the gasoline or carried a lighted lantern into said car or had one therein, and asserted that if any person carried a lighted lantern into said car or undertook to drain any gasoline from any automobile, they were not engaged in any business of the Warehouse Company, but were acting entirely outside the scope of their authority and employment as employees of the Warehouse Company.

The Railway Company denied generally and then set up that, at the time of the fire plaintiff's automobile had not been delivered to it, but was still in the hands of the Warehouse Company and its employees; that the loss was caused by the acts or defaults of the shipper or owner, or its or his servants, in attempting to drain gasoline from the automobiles and in taking into said car a lighted lantern while draining said gasoline. The allegations of the Warehouse Company's answer were also denied.

The replies of plaintiff to each of said answers were in the nature of general denials.

The respective owners of the other two automobiles, which were also destroyed, likewise brought suit against

both defendants, and as judgment went for the plaintiff in each of those suits, they too have been appealed and are now pending in this court, namely, Case No. 14435, Stevenson v. Atchison, etc., R. Co., and Case No. 14590, Ormsby v. A. B. C. Fireproof Warehouse Company. In the former, or Stevenson case, a dismissal as to the Warehouse Company was entered after the evidence was in, and judgment was obtained against the Railway Company alone; while in the .latter, or Ormsby case, the plaintiff, at the close of the evidence, dismissed as to the Railway Company and proceeded to judgment solely against the Warehouse Company. The evidence, in broad outline, is pretty much the same in all three cases, but, owing to important differences in certain details, and because of differences in pleading and the course pursued in each trial, reference cannot well be made to either one of the opinions in the other two cases for a statement of the facts, but they must be stated in this case as if it were the only one of the three before us.

The freight car into which the automobiles were loaded was especially designed for the shipment of automobiles, having, in addition to the usual side doors, a door in the end which afforded an opening as large as the end of the car itself. The freight car was set with its open end against the Santa Fe's loading dock, so that the automobiles could be run into the car and "blocked" or fastened therein, one after the other. Plaintiff's automobile was a Franklin while the other two were respectively a Haynes and a Lafayette.

The work of preparing and loading the automobiles for shipment was done by two of the Warehouse Company's employees, Hulse and Richardson, under the direction of said Company's superintendent, McLane, who was present, however, only a part of the time. The evidence is that the two men, under McLane's direction, were loading and fixing the Haynes automobile in the freight car when plaintiff's automobile was delivered to the Warehouse Company at the dock for plaintiff by the Lafayette Motor Car Company from whom he had

just purchased it. There is evidence that when the automobile was thus delivered and left on the dock at the end of the freight car, Wilcox, the man who delivered it, suggested that the automobile be drained and asked if he should drain the gasoline and water. He received a negative reply and was told that the men had tools to do that with and they would take care of that when they got ready for it. In order to drain the water it was necessary to open three cocks and Wilcox says he told the men it was easier for him to drain the water than to show them how to do it, and he thereupon did so. The man to whom Wilcox talked said he knew how to drain the gasoline and Wilcox left that to them, remarking "So far as the gasoline is concerned that is an easy matter." There is evidence that the man to whom Wilcox talked was McLane, though the latter, who was also placed upon the stand by plaintiff, says no such conversation as Wilcox testified to ever took place.

In loading the automobiles, the Haynes was first backed into and against the further end of the car, and, in order to obtain sufficient room for the other two, its front end, after the front wheels were removed, was elevated and propped in position by heavy timbers, so that the end of the next automobile could be run partly under the first one. The Haynes automobile was fastened in place by blocks or timbers nailed to the floor in front and behind and on each side of each wheel which were then also tied to the blocks. After the Haynes was fastened in place, the Franklin was run in and fastened by blocks in the same way and then plaintiff's automobile, the Lafayette, was rolled in and fastened in the same manner.

It required about six hours to put the automobiles in the car and fasten them in place. The men began work some time in the forenoon and finished fastening the Haynes automobile in place about noon or very shortly thereafter.

McLane left the two men at work loading the automobiles about 11 o'clock in the forenoon but returned sometime in the afternoon. When the work of fastening

the automobiles in the car was nearly but not quite finished, McLane went over to the office of the Santa Fe team track foreman, a man by the name of Freeman, and requested him to inspect the loading and place his O. K. on the bill of lading which McLane had prepared, but which would not be signed by the railway company until Freeman's O. K. as to the loading was thereon. Freeman went with McLane to the car, inspected the manner in which the automobiles were being fastened, and, returning to his office with McLane, placed his O. K. on the bill. At the time this was done the men were still at work in the car and had two wheels of the last automobile yet to block, requiring about fifteen or twenty minutes' more work. There is evidence on plaintiff's side that McLane wanted Freeman's O. K. on the bill of lading before the work of fastening the automobiles in place was finished, so that he, McLane, could obtain the Railway Company's signature to the bill and leave, as he was in a hurry to get away. Obtaining Freeman's O. K. on the bill of lading, McLane went back to the freight car and told the men to finish their work, and that, as soon as they had finished, to gather up the blocks remaining and their tools, put them in the automobile which Terrian (another Warehouse employee who was there repairing a slight damage to one of the wheels), had for his use, and return to the Warehouse Company's office. Then McLane went to the Santa Fe freight office, obtained the Railway Company's signature to the bill of lading and went either to his home or office.

The men finished the work of blocking the automobiles about 15 or 20 minutes to five o'clock. At some time, not disclosed when, Hulse suggested to Richardson that they drain the gasoline from the automobiles. When the work of blocking the automobiles was finished, the men put their tools in Terrian's car, but did not go away in it with him, but told him they were going to "stick around" and would go home on the street car; whereupon Terrian went away.

The two men, Hulse and Richardson, "waited around quite awhile" after they got the automobiles blocked be-

fore they began to drain the gasoline. About fifteen minutes after they had finished blocking, Hulse saw two men passing in an automobile, and asked one of them if he wanted some gasoline, proposing to sell him some if he could use it. The man said he could and that he would return for it shortly. They waited some time for him to return, but he did not come. Hulse then went to a telephone and, calling up Weinstein, a Warehouse Company employee at the latter's home, told him to come down and bring a can with him. While waiting for him to come, Freeman, the Santa Fe team-track foreman, asked the men if they had finished loading and Hulse replied that they had but were waiting to drain the gasoline if some one would come with a can so they could do so.

Freeman then went to the car and closed and sealed the side doors, nailing cards thereon which gave directions as to the train it should go out on and where the car was to be weighed. He would have also closed and sealed the open end door (after which the car would have been ready to go out of the yards and start on its journey) had not the Warehouse employee requested him to leave the door open so that he and his associate might drain the gasoline. Refraining, therefore, from closing and sealing the end door, Freeman left the seals for that door with his successor, Barry, who had come on duty for the night, telling him that when the men had finished draining the gasoline to close the door and seal it. The evidence shows that the car could not start until all doors were sealed. Freeman then left and went home about 6:30.

About ten minutes to seven, Hulse and Richardson began draining the gasoline out of the Haynes automobile. This was done by Hulse getting on his back underneath the automobile and unscrewing the tap at the bottom of the tank and allowing the gasoline to run out into a bucket. It was dark while doing this, and in getting the bucket out of the freight car, some of the gasoline was

spilled on the floor. Richardson suggested that he would get a lantern. He went over to the team-track foreman's office and borrowed one. He returned with it lighted and, entering the car, set it down, one witness says within two feet and others say with seven or eight feet, of the draining gasoline. Hulse had gotten one bucketful out of the Haynes automobile and it was carried out and poured into Weinstein's automobile. After the lantern was brought into the car, Breeding, a special officer or watchman in charge of and policing the Santa Fe premises, came to the car, and saw the men, knowing from their uniforms that they were employees of the Warehouse Company. He was told that Weinstein didn't bring any can and his car would not hold all the gasoline. Breeding said he would go and get a can, that he would be glad to get some of it, that he had an automobile of his own. He went away and returned with a ten gallon can. Hulse was at this time draining the Franklin automobile and Breeding stood there not far from the lighted lantern and looked on while several bucketsful of gasoline were taken from the Franklin, which process occupied ten or fifteen minutes. By this time there was one open container with gasoline in it on the floor of the car, and another with a small amount of gasoline in it and also gasoline running from the tank. There was also some that had been spilled on the floor of the car, which was forty feet long, nine feet wide and twelve feet high and the odor of gasoline could be distinctly smelled in the car which was closed except at the end. Suddenly a flame filled the entire car, the gasoline began burning and the men were driven hastily from the car and the fire continued to burn until the fire department put it out, but by that time the automobiles were destroyed.

The lantern was an ordinary switchman's lantern in which there was easy access of the fumes or vapor from the gasoline to the flame in the lantern, and there was no other fire or cause for the blaze in the car except the lantern. In view of these facts, and of the well-

known nature of gasoline, when opened in an enclosed space like this car, to volatilize and give off fumes or gas which, upon spreading to a flame, will ignite and set fire to the whole, there can be no merit in the contention that there is no evidence to show the cause of the fire or that it was caused by the lighted lantern. The jury were amply justified in finding that the lantern was the cause of the fire. [Brown v. Freeman, 84 N. J. L. 360.] The inflammable and volatile nature of gasoline whereby its vapor is given off under these circumstances and the tendency of the latter to spread to a nearby open flame and ignite, are matters of such common knowledge that any ordinary mind should apprehend the danger, and surely the jury could reasonably find that it was negligent to bring a lighted lantern into the car and drain the gasoline in such close proximity to it. [Van Bibber v. Swift & Co., 228 S. W. 69, 77; Bryan v. United, etc., Lamp Co., 176 Mo. App. 716; King v. National Oil Co., 81 Mo. App. 155, 165; Grigsby v. Bratton, 163 S. W. 804.]

Was a case of liability made against either one or both of the defendants, or should either one or both of their respective demurrers to the evidence have been sustained?

Before discussing the question of the liability of either of the defendants, it may be well to make a few observations more or less pertinent to both. While the delivery of the plaintiff's automobile to the Warehouse Company was a bailment to it for the purpose of a further bailment thereof to the Railway Company, yet the petition does not stand on bailment but alleges specific negligence, to-wit, that the servants of both defendants, acting within the scope of their respective authority, entered said freight car for the purpose of preparing the automobiles for shipment by draining gasoline therefrom and negligently brought a lighted lantern into the car and undertook to drain the gasoline with said lantern in close proximity thereto. Under this pleading, if the servants of both defendants entered the car, for the

purpose of preparing the automobiles for shipment, and the servants of each were acting within the scope of their employment, then both would be liable, and that too without regard to whether the shipment was or was not then in the exclusive possession and control of the Railway Company by reason of the issuance of the bill of lading: In such case it would not matter whether the Warehouse Company had partially or entirely relinquished the shipment to the custody of the Railway Company. Each defendant would nevertheless be liable for what its servants, acting within the scope of their authority, negligently did. Suppose that after the freight car had started on its journey, the Warehouse Company, remembering that it had failed to do some act necessary for the proper preparation of the goods for shipment, had stopped the car in transit, and, by permission of the Railway Company, had entered the car to complete the preparation, and, in doing so, had negligently destroyed the property, the Warehouse Company would be liable notwithstanding the provision in its contract with plaintiff that its responsibility should cease after delivery of the property in good condition to the carrier. In the case supposed, the Railway Company might also be liable if its servants participated in the negligent act which destroyed the property. And even if the Railway Company's servants did not negligently participate in that negligence, nevertheless if the persons who entered the car were not doing so as servants of the Warhouse Company, the Railway Company might be liable either upon the ground of negligence in permitting unauthorized persons to tamper with a shipment in the custody of the railway, or be held responsible under its common-law liability as an insurer; but the case is not bottomed upon either of these two last-named grounds, and hence these two matters do not enter here. The case before us, as hereinabove stated, is founded upon the specific charge that the servants of both defendants, acting within the scope of their respective authority, entered the car for

the purpose of preparing the automobiles for shipment by draining the gasoline, and, negligently brought a lighted lantern into the car and attempted to drain the gasoline with the lantern close by.

Now, with reference to the liability of the Railway Company, the evidence is unquestioned that the work of loading and preparing the automobiles for shipment was solely that of the Warehouse Company. The Railway Company had nothing to do with that, save to inspect and approve the manner of their being fastened in the car. The evidence is furthermore beyond dispute, because shown by plaintiff's own witnesses, that the Railway Company did not at this time require automobiles to be drained of gasoline in order to be shipped. That had been a governmental regulation during the war but it had been countermanded a year or more before.

In addition to this, while there is no doubt that, while the relation of bailor and bailee existed between plaintiff and the Warehouse Company, yet as between plaintiff and the Railway Company, the Warehouse Company was *plaintiff's agent*. Indeed, it was the shipper named in the bill of lading. We do not mean to say that plaintiff could not sue for this reason. No doubt he could, even if the bill of lading was in the name of the Warehouse Company, since it was a contract made for plaintiff's benefit. [Bushnell v. Wabash R. Co., 118 Mo. App. 618, 624.] But the point here made is that plaintiff cannot recover against the Railway Company if the loss was caused by the negligence of plaintiff's agent, *unless* the railway company also negligently participated in the act causing the destruction. [10 C. J. 114, sec. 155; Nunnellee v. St. Louis, etc., R. Co., 145 Mo. App. 17, 21; St. Louis, etc., R. Co. v. Pope, 140 S. W. 265, 267; American Lead Pencil Co. v. Nashville, etc., R. Co., 134 S. W. 613; Hart v. Chicago, etc., R. Co., 29 N. W. 597, 598; Coweta Co. v. Central, etc., R. Co., 60 S. E. 1018, 1022.] Now, the fact that the railway company did not require the gasoline to be drained as a preparation for

shipment did not make its servants negligent merely because they did not interfere and prevent the shipper's servants from doing so. For while the draining of the gasoline from the automobile was not required by any rule or regulation of the railway company, still it was a matter the Warehouse Company might very well do as a precaution it deemed necessary to be taken for the safety of the shipment, or because the owner of the automobile desired it to be done. And in this case there is evidence that when plaintiff's automobile was delivered to the Warehouse Company at the loading dock, a desire was expressed to have said automobile drained. Consequently, anything done by the Warehouse Company's employees in and about the preparation of the automobile, even though not required by the railway company, could be regarded by the railway employees, in the absence of notice to the contrary, as being within the authority of those who were doing it. [1 Hutchison on Carriers (3 Ed.), sec. 108, p. 105; 4 Elliott on Railroads, sec. 831, p. 134; McElvain v. St. Louis, etc., R. Co., 151 Mo. App. 126, 141; Donovan v. Wells-Fargo Co., 265 Mo. 291, 311-12.] There is absolutely no evidence whatever to show that the railway employees knew or had any idea the men who were draining the gasoline were not doing so as servants of the Warehouse Company but were acting outside the scope of their authority and solely for their own ends. Can it be. said then that the railway employees participated in the negligent act by which the property was destroyed? Breeding knew the men were employees of the Warehouse Company, and when he came to the freight car the draining of the gasoline was going on and the lighted lantern was already in the car. He was justly entitled to think (and there is no evidence even tending to show that he should have thought otherwise), that the men were rightfully engaged in completing the preparation of the automobiles for shipment by draining the gasoline, in accordance with their duty to the shipper, Warehouse Company, or

214 M. A.—24

to it as agent for the owners of the automobiles. It is true, a bill of lading had been signed, but at that time the work had not been finished and the shipper's servants had requested that the car be left open so that the gasoline could be drawn. Under such circumstances was it negligent in him, as a duty he owed to the shipper or the owner's agent, to interfere with, or to direct the manner in which, the work of the shipper or owner's agent was being done? The negligence charged was in bringing a lighted latern into the car and having it there while draining the gasoline. He did not do that. That was being done when he came to the car. He ought not to be held to have known, or even suspected, that the men were there solely on their own account and not for their master, and certainly this is true when plaintiff alleges in his petition, and the jury has found under the evidence, that the work of draining the gasoline was a part of the preparation of said shipment and that they were acting in the scope of their employment. It is true he got a can when he learned that the men did not have sufficient facilities to hold the gasoline, and he says he did this as he did not want gasoline poured on the ground about the premises. And Hulse says that after he got the can he did nothing, but stood there looking on. There is evidence that he would have received some of the gasoline for himself had not the fire occurred when it did. But the draining of the gasoline as a part of the preparation of the automobile for shipment was not the work of his master the railway company, but of the shipper the Warehouse Company, and when he entered the car with a can to receive gasoline that was already being drained with the lighted lantern nearby, he was not acting in the scope of his employment in assisting in that work, as the petition alleges; and merely because he was willing to receive for his own personal use some of the benefits or results of what the men were doing, ought not to make the railway company liable for what the other men were negligently doing, under the

case as made by the pleadings and the evidence. While the bill of lading had been signed, yet the shipper still retained a control over the goods to enable it to finish its work of preparation of the goods for the shipment which was solely its work and not the railway company's. And the specific negligence charged is shown by the proof to be the negligence of the shipper or agent of the owner and not that of any employee of the railway company. We are, therefore, of the opinion that the demurrer should have been sustained as to the railroad company.

As to the liability of the Warehouse Company, of course, under the charge in the petition, if the men, although otherwise its employees, were acting purely for their own ends and wholly outside the scope of any employment they had from the Warehouse Company, the latter should not be held responsible. However, we do not think it can be said as a matter of law that they were outside the scope of their employment and acting solely for their own purposes. The question is not what we might find to be the fact in this regard were we sitting as triers of the facts, but whether there is evidence from which the jury could find that they were within the scope of their employment.

As to this, there is evidence from which the jury could find that the removing of gasoline was a part of the regular work in preparing automobiles for shipment. As heretofore stated, there was a request from the owner of the automobile when it was delivered to the Warehouse Company that the gasoline be drained. There is evidence that when McLane left about 4:30 o'clock in the afternoon, he left Hulse and Richardson to complete the work and to do whatever was necessary in that regard. McLane testified that for six or seven years he had had charge of the work of preparing automobiles for shipment; and he admitted that it was "rather a custom to do those things" and that it was "because of the danger of fire" and that it was considered safer to remove

gasoline from automobiles for that reason; that the reason for the practice of removing gasoline was to protect the Warehouse Company's clients' property from the hazard of fire. He admitted that when asked in a deposition if, under a contract with owners to load and prepare their automobiles for shipment, his company did not take the automobiles to the railroad car, load them on it, block them, *drain them* and do anything else that was necessary to make them ready for shipment, he answered that they did all that except that they did not always deliver them to the depot, sometimes the customer delivered his own automobile.

Hulse testified that he had worked for the Warehouse Company for ten years; that he had been engaged in loading automobiles about four years; that during that time the employees generally drained them and usually did so if they had anything to put the gasoline in, and the men would either sell the gasoline or give it away getting a dollar or so as a "tip;" that they usually drained it out if they had a place to put it, and that such had been the custom practically ever since he had been with the Warehouse Company. Hulse was older than Richardson and the latter had never worked at loading automobiles before, and when McLane left the two men to finish the work, although McLane was talking to both of them, Hulse said he supposed McLane left him in charge of the work and he was the one who suggested to Richardson that they drain the automobiles. He further testified that the Warehouse Company loaded and prepared for shipment about two carloads of automobiles per month, and that they usually drained the gasoline, though sometimes they didn't; that on previous occasions McLane had seen the men draining the gasoline but never had stopped them from doing it. Hulse testified that he thought the gasoline was better out than in and he admitted that in a deposition he testified that he considered it necessary to drain the gasoline on account of the danger from fire, that it was his judgment that it

would be dangerous to the automobiles to leave it in; he further testified at the trial that the Warehouse employees were paid by the week and although the day's work ended at five o'clock they would not stop loading and preparing an automobile for shipment if it could be completed that night but would go on and finish it; that he thought it would be better and safer to take the gasoline out, and if nobody was objecting to it, he was going to get what he could for it; that in draining automobiles of gasoline they usually sold it, or when they gave it away they usually got a dollar or so in the way of a "tip." He further testified that after having finished blocking the automobiles, the reason he waited before beginning to drain the gasoline was in order to get something to put it in; and had there been anything there to put it in he would have gone right on draining the gasoline at once.

It is true the evidence is that no direct or express commands were given by McLane to drain the gasoline in this particular case, but the foreman left the men to finish the preparation of said automobiles for the shipment, and there is no evidence that the draining of the gasoline was not considered a part thereof, especially in view of the owner's expressed desire that it should be drained, and likewise there is no evidence that the men knew the draining of the gasoline was not a part of the preparation. If the men thus left in charge to finish the work, acting upon the idea that it was a part of the proper preparation of the automobiles and of their work, undertook to drain the gasoline, it would seem that the Warehouse company could not escape liability for the negligence in so doing, on the ground that the men were conclusively outside the scope of their employment. If they were seeking, in the line of their employment, to accomplish their master's work, the rule of *respondeat superior* applies, even though the particular act was not ordered by the master and was not intended by the master to be done. [Whiteaker v. Chicago, etc., R. Co., 252 Mo. 438, 458.] And that is true even though in do-

ing the work the men may also have had in mind the intention of selling the gasoline and appropriating the proceeds to their own use. [Hellriegel v. Dunham, 192 Mo. App. 43; Fellhauer v. Quincy, etc., R. Co., 191 Mo. App. 137; Chandler v. Gloyd, 217 Mo. 394.] Before we can interfere with the jury's finding we must hold that *conclusively* the men were not endeavoring to do the work of the master, but that, after working hours and after they had ceased the performance of their duties to the master, they returned to the car to steal the gasoline. If that were the fact, it is hardly reasonable that they would have been thereafter retained by the Warehouse Company in its employ, and yet the evidence is they were not discharged and are still working for it. Under all the evidence there was room for the jury to find that the men in removing the gasoline were seeking to accomplish the work of their master and were acting in the scope of their employment. [Barnes v. Missouri, etc., R. Co., 192 S. W. 1040; Green v. Standard Oil Co., 199 S. W. 746; Hinkle v. Chicago, etc., R. Co., 199 S. W. 227.]

The point that the petition fails to state a cause of action is without merit. The basis of the contention is that the petition alleges no facts to show that the employees of the Warehouse Company were within the scope of their employment. We think it does. It alleges that plaintiff delivered the property to the Warehouse Company to be forwarded to California; that said defendant accepted same and undertook to and did deliver the property to the Railway Company to be carried to California; that defendants placed the property in the car and then entered the car for the purpose of preparing the property for shipment and while draining the gasoline, negligently took a lighted lantern into the car and in so doing they were engaged in the business of the defendants and were acting in the line and scope of their employment. The petition was sufficient. [Fleishman v. Polar Wave Fuel Co., 163 Mo. App. 416, 420-421; Maniaci v. Interurban Express Co., 266 Mo. 633, 642-643.]

Evidence as to the custom or practice of the Warehouse Company to remove the gasoline from the cars they shipped was admissible as bearing on the question of whether the men in draining the gasoline were acting within the line of their employment. Custom or practice was not relied upon as one of the constitutive elements of the cause of action, but such custom or practice was merely an evidential matter in the case and therefore did not have to be pleaded. [Lightner v. Dunham, 195 S. W. 1055, 1057; Majors v. Kansas City Railways Co., 228 S. W. 517, 518.]

Numerous objections are made by defendant Warehouse Company to plaintiff's instruction 1, many of which are answered in the holding hereinabove. It was conceded that the men, Hulse and Richardson, were employees of the Warehouse Company, and hence there was no error in the instruction referring to them as such. [St. Louis, etc., Furnishing Co. v. Stoecker, 238 S. W. 841, 843.] The instruction did not, by so referring to the men, assume that they were at the time of the fire acting as such employees and acting within the scope of their employment but expressly submitted to the jury the question whether they were so acting or not. The charge that the instruction did not explain to the jury what would bring the work of draining the gasoline within the scope of their employment, is untenable since the instruction in submitting that issue required the jury to find that such draining was a part of the work of caring for and preparing said automobiles for shipment.

Instruction F. offered by the Warehouse Company was properly refused because it ignored the question of whether the Warehouse Company, through its servants, negligently destroyed the property, and simply directed the jury to find a verdict for said defendant if the property had been delivered to the railway company.

There is no merit in the contention that the verdict is defective. It recites that the jury found the issues for plaintiff and assessed his damages at $6475 "against both defendants."

Other contentions are made with regard to the admission of evidence. The assignments of error do not include these. We have considered them, however, and find them to be without merit. The principal foundation for the claim is that the man to whom Wilcox talked about draining the automobile, when it was delivered at the loading dock, was not shown to have any authority from or to be connected with the Warehouse Company. But, as we have heretofore stated, there was evidence that this man was McLane.

The judgment is reversed as to the railway company and affirmed as to the Warehouse Company. *Arnold, J.*, concurs. *Bland, J.*, in opinion filed, dissents as to the reversal of the judgment against the Railroad Company.

BLAND, J. (dissenting).—I think the case should be affirmed as to defendant Railway as well as to the Storage Company. While Breeding, the agent of the Railway Company, may not have had anything to do with the actual extracting of the gasoline and the handling of the lantern, he went for a container to hold the gasoline. This is enough from which the jury could say that he was there participating and assisting in what was going on. He was there to protect the property of the Railway Company and to see that none of the gasoline was spilled upon the premises. He knew that the lantern was being used and the jury could say that he knew and realized what was going on and the effects. Could not the jury say that Breeding was assisting in what was going on? I think so, and his master ought to be held liable.