BY THE

ST. LOUIS, KANSAS CITY AND SPRINGFIELD

# COURTS OF APPEALS

AT THE

OCTOBER TERM, 1915.

---

CHARLES HELLRIEGEL, Respondent, v. ROBERT J. DUNHAM and FORD F. HARVEY, Receivers and METROPOLITAN STREET RAILWAY COMPANY, a Corporation, Appellants.

**Kansas City Court of Appeals, October 4, 1915.**

1. **NEGLIGENCE: Personal Injuries: Master and Servant: Scope of Employment.** Plaintiff with other employees working under a boss around a rail bending machine was injured by one of his fellow servants throwing a rail against his knee. This fellow servant had been ordered to turn the rail end for end in order that it might be placed upon the machine. The servant in a fit of anger at the boss obeyed the latter's order but threw the rail with violence resulting in injury to plaintiff. *Held*, that the fellow servant in turning the rail around was acting within the scope of his employment and in the line of his duty although he may have intended that the rail should strike the boss. To make the master liable, the act must be done not only while the servant is employed in the master's business but it must be done in the course of that employment and be one that is in furtherance of the employer's business. If the servant is doing the work for which he is employed, the master is liable to a third person for an injury caused by either the manner or the mode of performance. If, however, the servant turns aside

from his work for however short a time, to effect a purpose of his own, the master will not be liable. The presence of ulterior motive or purpose in the servant's mind does not affect the master's liability where that which the servant does is in the line of his duty and in the prosecution of his master's work.

2. ———: ———: ———: ———: **Fellow Servants.** Under sections 5434 and 5439, R. S. 1909, plaintiff and his fellow servant did not have to be actually engaged in running a car in order to come within the meaning of the statutory phrase "operating a railroad" but only that they should be engaged in doing any work for the railroad which was directly necessary for the operation thereof and in this case there is sufficient evidence to show that the rails were being bent for the purpose of repairing an existing track of a road then being operated and hence the bending should be construed as incidental to the operation of the road.

Appeal from Jackson Circuit Court.—*Hon. Jos. A. Guthrie,* Judge.

AFFIRMED.

*John H. Lucas* and *Bruce Barnett* for appellant.

*Griffin & Orr* for respondent.

TRIMBLE, J.—Plaintiff was employed in the shops maintained by defendants in connection with the operation of their street railway system in Kansas City for the repair of the rolling stock, tracks, etc., of said railway. He, in company with two others, Bronstein and Manlove, was operating a rail bending machine under the direction of Sunner, a foreman or straw boss. Rails were being bent in a somewhat circular form for use in a curve on the tracks of the system at a street intersection. The rail bending machine was on wheels set upon a track and the rails to be bent were lying in a pile alongside the machine. In order to place one of these rails upon the machine, it was necessary that the rail be turned end for end. Sunner, the foreman, ordered Manlove to "Take the top rail and put

it around so they can put it on the rail bender.'' Manlove seized hold of the top rail which, owing to its position or shape, rested as on a pivot in the middle, and swung it violently around causing the flange of the rail to strike and injure plaintiff's knee. This suit for damages followed. Plaintiff obtained judgment for $762 and defendants have appealed.

It seems that Manlove was frequently late in coming to work or slow in getting at it after he arrived, and on this morning he either did not commence work as soon as boss Sunner thought he should or else did not enter into it with the spirit or zest the boss thought necessary. At any rate as the four men were about the rail bending machine in the performance of their work, Sunner scolded Manlove for his remissness and gave him the above-mentioned order to turn the rail around. Manlove, angered by the reprimand, seized the rail and threw it around with violence and plaintiff was struck on the knee as above stated. Plaintiff exclaimed ''Manlove, what are you trying to do, break my leg?'' Manlove replied ''No, not yours, but this ————'' referring to Sunner.

It is defendant's contention that under these circumstances there is no liability on the part of the master. It is insisted that Manlove, in angrily turning the rail around, was not within the scope of his employment nor acting in the line of his duty, but was attempting to commit an assault upon the foreman, an act of his own, for which the defendant should not be held liable.

The difficulty in determining whether a master is liable for injuries inflicted by a servant, under circumstances similar to these, arises not on account of vagueness or uncertainty in the rules of law on the point, but in the application of the law to the particular facts of each case. To make the master liable for an act of the servant, under circumstances such as we are here considering, the act must be done not only while the

servant is employed in the master's business, but it must be done in the course of that employment and be one that is in furtherance of the employer's business. [McPeak v. Missouri Pacific R. Co., 128 Mo. 617.] If the servant is doing the work for which he is employed, the master is liable to a third person for an injury caused by either the manner or the mode of performance. [Collette v. Rebori, 107 Mo. App. 711.] If the act of the servant is within the scope of his employment, the master will be liable although the servant does not obey his orders as to the manner of its performance. [Sherman v. Hannibal, etc., R. Co., 72 Mo. 62, l. c. 66.] It was formerly considered that the master was not liable for wilful or malicious acts of his servants, as distinguished from his neglect, unless the act was done pursuant to the master's express orders or with his consent, even though it was done in the line of the servant's duties. [26 Cyc. 1527.] But it is now well settled that the master is liable for the wilful or malicious acts of his servant where they are done in the course of his employment and within its scope. [26 Cyc. 1528.] As said in Whiteaker v. Chicago, etc., R. Co., 252 Mo. 438, l. c. 458, "At bottom, the doctrine of all well-reasoned cases is that, under the maxim *respondeat superior,* the master must answer in certain circumstances, for the wrongful act of his servant precisely as the principal must answer for those of his agent. The general rule is that the maxim, *respondeat,* applies when the servant, in the line of his employment about his master's business, seeks to accomplish his master's purposes and in doing so acts negligently, or wilfully and maliciously, or even contrary to his orders or criminally, in some instances. That general rule is hornbook doctrine and beyond dispute." Or, as stated in Grattan v. Suedmeyer, 144 Mo. App. 719, l. c. 723, "If the servant, in performing the work of the master, injures a person, either through malice or negligence, the master is liable, but if the servant is not

doing the work of the master at the time of the injury, but is, at that particular time, following his own inclinations aside from his master's work, the master is not liable, and this is the rule by which to test the master's liability.'' [See, also, Garretzen v. Duenckel, 50 Mo. 104; Canfield v. Chicago, etc., R. Co., 59 Mo. App. 354; Landers v. Quincy, Omaha, etc., R. Co., 134 Mo. App. 80.] In Stranahan Bros., etc., Co. v. Coit, 55 Ohio St. 398, 45 N. E. 634, 4 L. R. A. (N. S.) 506, it is held that a master is liable for the malicious acts of his servant, whereby others are injured, if the acts are done within the scope of the employment, and in the execution of the service for which he was engaged by the master. In 2 Mechem on Agency (2 Ed.), sec. 1929, it is said, ''The tendency of the modern cases is to attach less importance to the motive with which the act was done, and to give more attention to the question as to whose business was being done and whose general purposes were being promoted.'' Or, as stated in section 1957 of that work, we should ''attach less importance to the motive with which the act was done and give more attention to the question whether or not it can be deemed to fall within the course of the servant's employment.'' And in section 1960, the author says, ''It has been held in a great variety of cases that the master is liable for the wanton or malicious acts of his servant if they were committed while the servant was acting in the execution of his authority and within the course of his employment.''

Now the evidence in this case shows that the injury resulted from the manner in which the rail was turned around preparatory to being placed on the machine. Manlove, the servant, was doing what he was employed to do and what he was specifically directed by the straw boss to do. The act of turning the rail was in furtherance of the master's business and within the scope of the servant's employment. In doing this, the servant did it angrily and without a due regard for

the safety of his co-employees. But defendants say he
was actuated by a malicious motive toward Sunner,
the straw boss. True, but he did not step aside from
his employment to do an act outside thereof to effect-
uate that motive. He did the very thing required of
him but in the method or manner of doing that act,
he performed it negligently toward plaintiff and mali-
ciously toward the boss. His duty to turn the rail
about was performed, but his feeling of animosity to-
ward the boss caused him to perform that duty in a vio-
lent and reckless manner, resulting in injury to the
plaintiff. This being so, the application of the princi-
ples above mentioned constrain us to hold the master
liable. It is true, if the servant *turns aside from his
work,* for however short a time, to effect a purpose of
his own, the master will not be liable. As, for instance,
where the servant on a hand-car concluded to put his
hat on the floor, and, in doing so, placed his body in the
way of the flying handles of the car whereby he was
catapulted against another throwing the latter off and
injuring him, it was held the master was not liable.
Here, the putting of the hat on the floor was no act in
furtherance of the master's business. [Overton v. Chi-
cago, etc., R. Co., 111 Mo. App. 613.] Or, where a serv-
ant leading a colt to water invites a boy to ride the colt
and the boy is injured, the master is not liable, since
the invitation to ride was no part of the servant's work.
[Bowler v. O'Connell, 27 L. R. A. 173.] In the same
way, a servant who, being in charge of a compressed
air hose, turned aside from the work he was engaged
in and sprayed an associate with air in a spirit of fun
and killed him, the master was held not to be liable.
[Galveston, etc., R. Co. v. Currie, 96 S. W. 1073.] But
there was no turning aside from his work on the part
of the servant in the case at bar. The turning of the
rail was the thing he was required to do and it was the
act that did the injury. The servant did that which
was in the line of his duty and which was in the prose-

cution of the master's work. The only unusual feature in it was the presence of personal motive in the mind of the servant. But the personal motive cannot exempt the master where the act done, which causes the injury, was in the line of the servant's duty and in the prosecution of the master's work. As said in the Currie case, supra, page 1074, "It may be further conceded that if, in directing the hose at a fire to put it out, he had also struck with it one of the other servants, either to make him get out of the way, or for some other purpose, the motive thus partly influencing his act towards such other would not deprive it of its legal character, as done in the master's business. It is in cases of the character supposed, where there has been a mingling of personal motive or purpose of the servant with the doing of his work for his employer, that much of the difficulty and conflict of opinion have arisen in determining whether or not the wrong committed should be ascribed to the master or be regarded as the personal tort of the servant alone. It is now settled, in this State at least, that the presence of such a motive or purpose in the servant's mind does not affect the master's liability, where that which the servant does is in the line of his duty, and in the prosecution of his master's work. But, when he goes entirely aside from his work, and engages in the doing of an act not in furtherance of the master's business, but to accomplish some purpose of his own, there is no principle which charges the master with responsibility for such actions." In Ritchie v. Waller, 63 Conn. 155, 27 L. R. A. 61, it is held that in most cases it is a question of fact whether or not the act of a servant for which it is sought to hold the master responsible was done in the execution of the master's business and within the scope of the servant's employment. The act of turning the rail was in the line of the servant's duty and it was in furtherance of the master's business. The motive of

192MA4

animosity the servant had toward the boss did not cause him to throw the rail but did cause him to throw it recklessly. This was merely the manner of performance for which, as we have seen, the master is liable.

In making the foregoing observations, we are not unmindful of defendant's very earnest insistence that the evidence does not show that the injury was caused by Manlove's turning of the rail around in the service of getting it ready for placing on the machine, but that he threw the rail at Sunner intending to assault him and was not engaged in the service of turning the rail. An unbiased and careful examination of the whole evidence, however, discloses that such view is untenable and that the act was done as we have stated. Whether the act was done as plaintiff contends or as defendants construe it, was a question of fact, and was submitted in instructions to the jury, and as there was ample evidence from which they could find that the rail was turned in the service of the master as we have stated, their finding must be respected. We do not think plaintiff's answers of "Yes, sir" to the carefully worded questions of a skillful cross-examiner should be deemed to conclusively overturn the clear, plain and unequivocal statements of the facts as detailed by the plaintiff whenever asked to give his own version of them. Notwithstanding these artless answers of the old man to questions which required nice discrimination in order to answer them strictly, we think it was the province of the jury to look at his whole evidence and determine the effect thereof.

There was no variance between the petition and proof. The petition alleged the character of the act in relation to the plaintiff. In so far as he was concerned the act was negligent although the one doing the act may have been actuated by a wrongful intentional motive toward another.

The fact that plaintiff and Manlove were fellow servants is no defense in this case. [Secs. 5434 and

5439, R. S. 1909.] They did not have to be actually engaged in running a car in order to come within the meaning of the statutory phrase "operating a railroad" but only that they should be engaged in doing any work for the railroad which was directly necessary for the operation thereof. [Callahan v. St. Louis Merchants Bridge, etc., R. Co., 170 Mo. 473, l. c. 495; Salmon v. Chicago, etc., R. Co., 168 S. W. 829; Vannest v. Missouri, K. and T. R. Co., 168 S. W. 782; Madden v. Missouri Pac. R. Co., 167 Mo. App. 143.] It is conceded that if rails were being bent for the purpose of repairing an existing track then being operated, then the bending might be considered as incidental to the operation of the road. But it is urged that the evidence does not show whether the rails were for use in a new track or for a track already in operation, or in other words, there is nothing to show whether this work was not in *construction* of a new track instead of maintenance and *operation* of a railroad. The evidence, however, shows that defendants admitted the operation of the railway system in Kansas City and the maintenance of the shops for the purpose of repairing the tracks. The evidence shows that the rails being bent were rails that had been in use and at the time of the injury the rails being bent were for use at 27th and Lister streets. It would seem from all this that the rails were intended for use in connection with a railroad already in operation and not for one being constructed.

There was no error in refusing defendants' instructions No. 6 and 7. They were erroneous because they told the jury, without qualification, that if the rail was intentionally thrown or swung around by Manlove for the purpose of striking Sunner then plaintiff could not recover. But, as we have seen, the personal motive commingled with the servant's act will not have the effect of conclusively relieving the master of liability. That question "cannot always be deter-

mined merely by putting a label on the motive" of the servant. [2 Mechem on Agency (2 Ed.), sec. 1929.] As said by the same author, section 1962, "The question is rather, as has been explained, whether the act can fairly be regarded as a natural incident to, a direct outgrowth of, a natural ingredient in, the execution of the service which the master confided to the servant. If that be the character of the act, the master is liable though the act were done wilfully or maliciously."

There being no error in the record the judgment is affirmed. All concur.