A. B. ORMSBY, Respondent, v. A. B. C. FIREPROOF WAREHOUSE CO., Appellant.

In the Kansas City Court Of Appeals, April 2, 1923.

1. **WAREHOUSEMEN:** Negligence: Warehouseman Held Liable for Negligent Acts of Servants in Setting Fire to Shipment of Automobiles Contained in Freight Car, Though Bill of Lading Was Signed and Possession of the Goods Accepted by Railway Company. Where servants of a warehouse company, acting within the scope of their authority, negligently set fire to automobiles placed by them in a freight car for shipment, which resulted in their destruction, *held* warehouse company was liable for the loss, though the bill of lading was signed and the possession of the goods had been accepted by the railway company.

Ormsby v. Fireproof Warehouse Co.

2. **APPEAL AND ERROR:** Question for Jury: Where There is Evidence from Which Jury Could Find Issue of Fact for Either Party, its Finding Must be Accepted. Where there is evidence from which jury could reasonably find an issue of fact for either party, the question becomes one for the jury and its finding must be accepted.

3. **EVIDENCE:** Custom: Usage: Question of Whether There was a Custom in the Legal Sense of That Term Determined from Facts Disclosed by Testimony Rather Than from Mere Use of Word ''Custom.'' The question of whether there was a "custom" in the legal sense of that term, should be determined from the facts disclosed by the testimony rather than from the mere use of the word "custom" in questions or answers.

4. **WAREHOUSEMEN:** Negligence: Custom: Warehouse Company Held Liable for Negligent Acts of Servants in Setting Fire to Automobiles While Draining Gasoline Therefrom, Without Orders so to do, Although Practice so to do Was not so Uniform as to Make it a Custom in Strictest Legal Sense. If automobiles loaded by warehouse company, in freight cars for shipment, were drained as a rule, so that employees thereof, who had placed the same therein, were led to believe that gasoline should be drained therefrom, and undertook to do it, in acting for the company to accomplish their employer's work, the company cannot escape liability for the negligence of its employees in setting fire to them while draining the same, on the ground that no orders were given them to do so, even though the company's practice in doing so was not so uniform and universal as to make it a custom in the strictest legal sense.

5. ———: Master and Servant: Respondeat Superior: Scope of Employment: Question of Whether Servants of Warehouse Company in Draining Gasoline from Automobile, Acted in Scope of Their Employment, Held for Jury. The question of whether servants of a warehouse company were acting within the scope of their employment, seeking to accomplish their master's work, in undertaking to drain gasoline, after working hours, from automobiles, negligently set on fire by them while so doing, after loading the same in a freight car for shipment, *held* for the jury, though the particular act was not ordered or intended by the master to be done, and even though in so doing the servants may have intended to sell the gasoline and appropriate the proceeds to their own use.

6. **PLEADING:** A Petition in Action Against Warehouseman for Loss of Automobile Negligently Set Fire to by its Servants, Held to Sufficiently State a Cause of Action. Where petition alleged that defendant, warehouse company, for hire, accepted and undertook to

214 M. A.—22

deliver an automobile to a railway company for shipment, that it placed the same in an inclosed freight car belonging to the railway company, that its servants entered said freight car for the purpose of preparing said automobile for shipment and draining gasoline therefrom, that the draining of the gasoline therefrom was necessary to prepare said automobile for shipment, and that while so doing fumes or vapor from the gasoline were ignited by a lighted lantern negligently carried by said servants into said freight car, causing a fire, which totally destroyed said automobile, sufficiently stated a cause of action.

7. ———: Where Original Petition Alleged That Automobile Negligently Destroyed by Fire was Delivered by Warehouseman to Railway Company, Held not to Constitute a Conclusive Admission Against Interest Defeating Recovery. In an action against a warehouse company to recover for loss of an automobile negligently set fire to by its servants after being placed in freight car for shipment, where the original petition alleged that automobile was delivered by the warehouse company to railway company, *held* not to constitute a conclusive admission against interest, sufficient to defeat recovery, in view of the pleading and proof as to negligence of warehouse company's servants, while acting within scope of their employment, in setting fire thereto, it being immaterial where or in whose possession the goods were at the time.

8. EVIDENCE: Proximate Cause: Evidence Held Sufficient to Justify Finding by Jury That Lighted Lantern Negligently Taken into Freight Car was Cause of Fire, Destroying Automobiles Therein. Where the evidence showed that there was no other fire or cause for a blaze in a freight car, except a lighted lantern, which employees of defendant negligently set down in close proximity to gasoline being drained from automobiles therein, *held* to justify finding by jury that the lantern was the cause of the fire.

9. ———: The Inflammable and Volatile Nature of Gasoline, and Tendency of Its Vapor to Spread to Nearly Open Flame and Ignite, are Matters of Common Knowledge. The inflammable and volatile nature of gasoline whereby its vapor is given off and the tendency of the latter to spread to nearby open flame and ignite, are matters of common knowledge that any ordinary mind should apprehend the danger.

10. DAMAGES: The Fact That Plaintiff Had Insurance on Automobile Destroyed by Fire and Collected it, Does not Affect Question of Defendant's Liability. The fact that plaintiff had insurance on automobile destroyed by fire, and collected it, does not affect the question of defendant's liability.

Appeal from the Circuit Court of Jackson County.—
*Hon. O. A. Lucas,* Judge.

AFFIRMED.

*Marcy K. Brown, Jr.* for respondent.

*William G. Holt* and *J. K. Cubbison* for appellant.

TRIMBLE, P. J.—Plaintiff's action is to recover the
loss of an automobile and its accessories which were
destroyed by fire.  He obtained a judgment for $2200
and defendant appealed.

The suit was brought against, and the trial was
started with, two defendants in the case, the defendant
Warehouse Company and the Atchison, Topeka and San-
ta Fe Railway Company.  At that time the petition al-
leged that on October 25, 1920, plaintiff delivered said
property to the warehouse company to be forwarded
from Kansas City to Los Angeles, California; that de-
fendant Warehouse Company, for hire, "accepted said
property and undertook to *and delivered* the same to
defendant, Atchison, Topeka and Santa Fe Railway
Company, to be carried by said railway company" from
Kansas City to Los Angeles; that "said defendant, Atch-
ison, Topeka and Santa Fe Railway Company, *as a
common carrier for hire,* on or about said date, *accepted
said property and undertook* to carry same from Kan-
sas City, Missouri, to Los Angeles, California, and to
redeliver same to plaintiff or his agents at Los Angeles,
California;" that on said October 26, 1920, defendants
placed said property in an enclosed freight car belong-
ing to the Railway Company along with the other automo-
biles belonging to other parties; that "thereafter defend-
ants, their agents, servants and employees entered said
freight car for the purpose of preparing said car for ship-
ment and for the purpose of draining and removing the
gasoline from the storage tanks of one or more of said au-

tomobiles so stored in said freight car, and, in doing so, negligently carried a lighted lantern into said inclosed freight car and negligently undertook to so drain and remove said gasoline from one or more of said automobiles in said car while the lighted lantern was near by;" that they knew or should have known of the danger, and that while so draining said gasoline the vapor therefrom was ignited by the lantern, causing a fire which totally destroyed said property; that the loss was directly caused "by the aforesaid negligence of defendants, their agents, servants and employees, that the aforesaid negligent acts of said agents and servants and employees were performed by them while they were engaged in and upon and about the business of defendants and within the line and scope of their respective authorities, and while they were employed as the agents, servants and employees of the respective defendants."

The answer of the Warehouse Company admitted that it received the property from plaintiff for the purpose of delivering the same to a railway company to be carried by the latter at the owner's cost from Kansas City to Los Angeles, such reception of said property by the defendant warehouse company being under a written contract between it and plaintiff which provided that, in receiving said property, it "was acting only as agent for the owner and not in the capacity of a common carrier," that while the property of the plaintiff should be in the possession of the Warehouse Company its liability "should be that of a warehouseman only," that the property was to be delivered to the railroad company subject to the terms of the railroad's uniform bill of lading, and that the responsibility of the Warehouse Company "should cease upon delivery of said property in good condition to such railroad company."

The answer of the Warehouse Company further set up that it delivered said property to the Atchison, Topeka and Santa Fe Railway Company by putting the same in the latter's freight car; that the railroad com-

pany issued its bill of lading for the said property and received and accepted the same after it had inspected said property; that the property was destroyed by fire after it was in the possession of the railway company. Said answer set up that if any persons carried a lighted lantern into said car, they were "acting entirely without the scope of their authority and employment as agents and employees of the said defendant A. B. C. Fireproof Warehouse Company."

At the commencement of the trial the defendant Warehouse Company moved for judgment on the pleadings, as to it, because the petition showed that the fire occurred after the property had been delivered to and was in the possession of the railway company, and the responsibility of the Warehouse Company had ceased. This motion was overruled. Whereupon plaintiff amended his petition by interlineation by striking out the words and parts thereof italicised in the above quoted portion of said petition and inserted; in place of the last italicised phrase, the words "furnished a box car" so that, as amended, the petition charged that the defendant Warehouse Company for hire "accepted said property and undertook to deliver same to defendant, Atchison, Topeka and Santa Fe Railway Company to be carried by said railway company, from Kansas City to Los Angeles; that "said defendant, Atchison, Topeka and Santa Fe Railway Company, on or about said date, *furnished a box car* to carry same from Kansas City, Missouri, to Los Angeles, California, to redeliver same to plaintiff or his agents at Los Angeles, California." In all other respects the petition remained the same.

At the close of the plaintiff's evidence he again amended his petition by interlineation by inserting therein, after the allegation that defendants' servants entered said freight car for the purpose of draining and removing the gasoline from the automobiles stored in said car, the words "which said drawing of gasoline was necessary to prepare plaintiff's automobile for shipment."

The plaintiff then dismissed as to the defendant Atchison, Topeka and Santa Fe Railway Company. The remaining defendant, Warehouse Company, then offered a demurrer to the evidence which was overruled. Said defendant then offered in evidence the plaintiff's petition as it was before the amendments by interlineation with special reference to those parts wherein it was stated that the property was delivered to and accepted by the railway company and was afterwards burned. The defendant Warehouse Company then introduced one witness, simply as to the value of the automobile, and rested. It then again demurred to the evidence and was overruled.

The facts, as gleaned from the witnesses placed upon the stand by plaintiff, are as follows:

As a part of the defendant Warehouse Company's business, it collected automobiles into car-load lots of three each, when that many were obtained for shipment to the same point. In this way each owner of a shipped automobile paid his proportion of the freight on the carload, which was much less than if his automobile were shipped separately. The Warehouse Company collected from each owner his proportion of the freight together with an additional sum which constituted defendant's compensation for the service it rendered.

Desiring to ship his automobile to Los Angeles, California, in a collective car-load consignment and thereby obtain a lesser rate, plaintiff delivered his automobile to the defendant Warehouse Company, and the latter accepted it for the purpose of forwarding it to said point, acting, however, "only as agent for the owner and not in the capacity of a common carrier." A further provision of the contract was that the responsibility of the Warehouse Company should "cease upon delivery of goods to the railroad company in good condition."

Plaintiff's autmobile was a Franklin, and defendant having two other cars, a Haynes and a Lafayette, for shipment to Los Angeles, loaded the three into a freight

car of the Atchison, Topeka and Santa Fe Railway, for shipment over that road. The freight car was specially designed for shipping automobiles, having in addition to the usual side doors, a door at each end as large as the end of the car. This freight car was backed up to the Santa Fe loading dock with its open end at right angles thereto. In order to get three automobiles into the car, the Haynes was backed into the car until its rear was against the further end of the car; then the front wheels of the automobile were taken off and the front end of the automobile was raised until the automobile was at an angle of 45 degrees where it was propped by heavy timbers. To keep the automobile from moving backward or forward heavy blocks were nailed to the floor in front of and behind each wheel; and to keep it from moving sidewise, a two-by-four was nailed to the floor along each side of each wheel; and to prevent any upward motion a strip of burlap was wrapped around the spokes and over the felloe of each wheel and securely nailed to the two-by-fours. (In taking off the front wheels of the first, or Haynes, automobile, the threads on one of the spindles were slightly injured, and defendant's mechanic, John Terrian, who will be mentioned hereafter, was, at some time during the day, sent for to repair it.) After having placed the Haynes automobile in the car, plaintiff's Franklin automobile was then run into the freight car with its end under the upraised end of the Haynes automobile. It was then secured in place in the manner hereinbefore indicated. Then the Lafayette automobile was run into the car and securely fastened in the same way.

The work of loading the automobile into the car as above described was done by the defendant Warehouse Company's two employees, Hulse and Richardson. McLane, defendant's outside superintendent, was there at first and he backed the Haynes automobile into the car. Hulse's and Richardson's work on that occasion was to load the automobiles into the car, and prepare or make

them ready for shipment.  McLane stayed there until the
Haynes automobile was raised up at the front end and
then he went away to look after his other duties, leaving
Hulse and Richardson to finish the work of loading the
automobiles.  The work of loading the automobiles was
begun about 10:30 a. m. of October 26, 1920.  The two
men completed the work of fastening the Haynes automo-
bile shortly after noon, about one o'clock.  They then
ran the Franklin automobile in and fastened it in posi-
tion, finishing that about 3 o'clock.  They then ran the
Lafayette automobile in and fastening it about 4:30 or
20 minutes to 5 o'clock.  During the progress of their
work McLane came back a little while in the afternoon
and then left but returned somewhere about 4 o'clock.
At that time Terrian was there finishing filing a thread
on one of the damaged wheels of the Haynes automobile.
Hulse and Richardson had nearly finished fastening the
automobiles, having only two wheels to block.  McLane
then went, with the bill of lading for the shipment, to the
office of Freeman (about 100 feet away) to get him to
inspect the loading.  Freeman was the Santa Fe's team-
track foreman, and his duty was to inspect all outward
bound shipments to see if they were properly loaded,
and, if he found they were, he indicated his approval
by placing his O. K. on the bill.  Freeman came with
McLane to the car and inspected the way in which the
automobiles were loaded.  At this time Hulse and
Richardson were working on the last two wheels of the
last automobile, and when McLane and Freeman left,
the men had only two more blocks to nail down on said
two wheels.  McLane and Freeman went back to the
latter's office where Freeman put his O. K. on the bill
of lading, whereupon McLane went to the Santa Fe
freight offices where the bill was duly signed by the rail-
way company and then McLane went to the Warehouse
Company's office.

When McLane left the freight car he told the two
men to complete the loading and told Terrian in their

presence and hearing that he would leave his, McLane's, automobile there for him to bring the men and their tools back to the office, and that when they had finished, to put the tools in the automobile and all of them come to the office. Terrian got through his work before the two men did, but he waited for them, and when the men got through blocking the automobiles they placed all of their tools in Terrian's automobile except a pair of pliers which Hulse kept with which to open the plugs to drain the gasoline. The men told Terrian that they would not go away in the automobile but would ride home on the street cars. Thereupon Terrian went away with the tools, leaving Hulse and Richardson there. Hulse says the reason they stayed there was to drain out the gasoline, that had they had anything to put the gasoline in they would have proceeded to drain it as soon as they finished blocking the cars, but they did not have anything to put it in and he would not have thought of pouring it on the ground. A short while after Terrian left, Hulse saw two men passing in an automobile and asked the one in charge thereof if he wanted some gasoline, proposing to sell it to him. The man said he could use some and went away promising to return for it in half an hour. The men waited for him to return but he never came. It was then getting dark. The men went to the Rock Island freight office and called up at his home Weinstein, another employee of the Warehouse Company and told him to come down and to bring a can. Weinstein came in his automobile but did not bring a can.

Hulse then began to drain the gasoline out of the Haynes automobile by getting under it on his back and unscrewing the plug in the bottom of the tank and allowing the gasoline to run out into a small open bucket they had obtained from somewhere near by. Hulse says they began draining the gasoline at seven o'clock. Richardson says they began at 6:30. It was then dark. Hulse had to "feel around in the dark" and drew one bucketful and it was put into Weinstein's car. In getting the

bucket out of the freight car about a pint of gasoline was spilled on the floor. Richardson, in the meantime having, at his own suggestion, gone to the Santa Fe engine room or some neighboring office in the yards and borrowed a lantern, returned with it lighted and it was set down on the floor of the freight car about five feet from where the draining was being done. Breeding, the Santa Fe special officer or watchman policing the Santa Fe premises, whom the man had told they were going to drain the gasoline, came to the car and was told that Weinstein did not bring any can, whereupon he said he would get a can. He returned with it, and by this time Hulse was draining the Franklin automobile. Possibly two bucketsful were drained out of the Franklin and one of the open receptacles overflowed and spilled some more gasoline on the floor, when suddenly there was a flash and a flame filling the entire car, and of course the drained and draining gasoline was instantly ablaze. The men got out as quickly as they could and the fire department was called, but the automobiles were destroyed.

Freeman, the Santa Fe team-track foreman who placed his O. K. on the bill of lading, says that shortly after McLane left with it for the freight office, he received a telephone message from that office, directing him to "card" the car, that is, to place cards on the door, giving the number of the train the car was to go out in, and where it was to be weighed; that directions were given him over the telephone that the car was to go out in Los Angeles train No. 33 as special through freight to be weighed at Argentine, Kansas. He made out the cards and after the men had finished blocking and had come out of the car, he closed and sealed the side doors with railroad seals, and put two cards on each of said doors, one a white card showing that the freight was to be weighed at Argentine and the other a "red ball" card showing that the car was to go out on the special fast freight train No. 33. Although Freeman sealed the two side doors of the freight car, he did not close or

seal the end door because one of the two men, Hulse or Richardson he did not know which, told him to leave it open as they were going to drain the gasoline. Freeman testified that if they had not made that request he would have closed and sealed the end of the car also. He also said there was a rule of the railroad, forbidding gasoline to be thrown out on the premises of the company; that while it had formerly been the railway company's rule to require gasoline to be drained out of automobiles, yet such requirement was not then in force, the same having been countermanded; but at this time there was no rule requiring or making it necessary to drain automobiles before they would be shipped. He testified, though, that it was *generally the custom* of the packers of automobiles for shipment *to drain the gasoline out of them.*

After carding the car and closing the side doors as aforesaid, Freeman telephoned the yard-master the car would be ready, but that he could not get it before about seven o'clock as there was gasoline to be drained out of the automobiles. This, of course, occurred shortly before the fire.

Defendant's view appears to be that, if the fire was caused after the bill of lading was signed and the possession of the goods had been accepted by the railway company, that fact *ipso facto,* absolves it from liability. But we apprehend that this does not decide or settle the question. If the servants of the Warehouse Company, proceeding in such manner that what they did was its act, entered the car and negligently set fire to and destroyed its contents, it would not seem to matter whether the Warehouse Company had partially or entirely relinquished control over the shipment to the railway company, for it still would be liable for what its servants, acting within the scope of their authority, negligently did. Even if, after the car had started on its journey, the Warehouse Company had stopped it in transit and had entered the car to perform some act connected with

the preparation of the goods for shipment, and in doing so had negligently destroyed the property, would not the Warehouse Company be liable therefor? We think it would, notwithstanding the provision in the contract that its liability should cease after delivery to the railway company. So that the question of whether the Warehouse Company should be held liable does not depend upon, nor is it settled by, the determination of the question in whose possession the goods were at the time of the fire.

The important question is whether there is any evidence from which the jury can reasonably find that the men, Hulse and Richardson, were acting as servants of the Warehouse Company and within the scope of their employment? We think there is evidence from which the jury could find either way, and as it was a jury question and the jury had found that they were, the finding must be accepted.

Hulse had been in the employ of the Warehouse Company for a number of years and had much experience in loading automobiles shipped as these were. Richardson was a younger man than he, and had never done any work preparing automobiles for shipment before, and although the evidence is that McLane, when he left, was giving directions to both men, yet there is evidence that Hulse considered he was left in charge of the work, and, in a deposition taken before the trial, he testified that he was. McLane said the work the men were supposed to do was to load the automobiles, block them in and fix them ready for shipment. He went away leaving the two men to finish the work. He thought they were capable of ''finishing the car'' and left them there to complete the work and he says ''I don't remember just what I said to them.'' Hulse said he was told, or both of them were told, to ''finish it,'' to ''finish blocking that car,'' to ''finish those blocks there,'' and to ''finish the car'' and finally admitted that in his deposition he testied that McLane ''just told me to complete the loading

of the cars." At the trial he said McLane did not give. him any special instructions with regard to the work, but he thought McLane left him there to use his best judgment, and that was what he was doing and that the last thing he undertook to do was to drain the gasoline; that there was as much as fifteen gallons of gasoline in the Franklin automobile, and when asked if it was the custom of his company to drain gasoline from automobiles before they were shipped, he said they were generally drained, though sometimes they let them go without being drained, but where there was so much as fifteen gallons of gasoline in, they usually took it out; that automobiles were drained before, and sometimes after, they were run into the car; that he didn't know whether it should be called a 'custom or. not, but, as a rule, the gasoline was taken out. As heretofore stated, there is evidence that if he had had anything to put the gasoline in he would have gone to draining the gasoline immediately and the reason he waited some time before doing it was because he had nothing to put it in. He further said that he removed the gasoline from the automobiles because he considered it dangerous to leave it in them and "thought it was best to take it out." "I thought it was best to take it out, I didn't think it was safe to leave it in." "I thought it might cause a fire to leave it in there" and it might cause damage to the cars in transit. "I thought it was best (to remove the gasoline), yes, sir, because it might slip out, I thought a plug might come off the tank or something." The testimony was further that on other occasions gasoline was removed from the cars when McLane was present. McLane admitted this and said he did not forbid it being done. McLane further testified that at one time there was a custom to drain automobiles, but that it did not exist at that time; that automobiles were drained *when customers required it to be done,* and that during the war they had often required it, but not so very long after the war, they had not been

.drained. In the course of a long and persistent examination he finally admitted that "We had drained cars on some occasions. It was rather a custom to do those things." He admitted that in a prior deposition he gave the following answers to the questions here set out:

"Q. And why is it a custom to do those things? A. Why, it is on account of the gasoline that is in the cars, of course.

"Q. Because of danger of fire? A. Yes.

"Q. And you considered it was safer to remove the gasoline from cars for that reason? A. Yes, it was the safest proposition if they had any gas in them.

"Q. And that was the reason it was the custom to remove gasoline, to protect your client's property against the fire hazard? A. Why, yes, it was customary."

He then was asked, at the trial, how long that custom had existed and finally, after persistent cross-examination by counsel for the railway company, he said he judged the custom had existed for two or three years. Of course, the question of whether there was a "custom" in the legal sense of that term on the part of the Warehouse Company to drain the automobiles, should be determined from the facts disclosed by the testimony rather than from the mere use of the word "custom" in question or answer. But, although McLane said they sometimes shipped automobiles without draining them, this would not *conclusively* show that the men were not acting as servants of the Warehouse Company. For if automobiles were drained as a rule, so that the men were led to believe that these automobiles should be drained, and undertook to do it, acting for the Warehouse Company and to accomplish their master's work, the Company cannot escape liability on the ground that no orders were given to the men to take the gasoline out of the cars on the occasion in question even though the Company's practice of removing gasoline was not so uniform and universal as to make it a custom in the strict-

est legal sense. While there is no evidence in this case that any one of the owners of the automobiles requested the gasoline to be drained out of his machine, yet neither is there any evidence that the men knew the automobiles were not to be drained, unless that is to be inferred from McLane's directions to the men when he left. It is clear, however, that nothing was said to them concerning that matter, so that it cannot be said that *conclusively* the men were not seeking to drain the gasoline as a part of their master's work. It is true, Richardson said that "nothing was said about draining the gasoline till we were loaded" and then Hulse mentioned it to him; that it was "just our own thought;" that "we just said between ourselves, Hulse and I, that maybe we better drain this gasoline out." But he had never done this work before and he cannot conclusively decide what was in Hulse's mind in suggesting that the gasoline be drained. Besides, Richardson's idea that it was just their own idea doubtless meant no more than that it did not have any basis in a command from McLane to do it. While both men said their working time began at 7:30 a. m. and ended at 5 or 5:30 p. m. and that they were paid for working over time but made no claim, nor were they paid, for over time on this occasion, yet this does not conclude the right of the jury to pass on the question of whether, in what they did, they were acting as servants of the Warehouse Company or whether they did it solely for their own purposes of obtaining and selling the gasoline. If the men thus left in charge to finish the work, acting upon the idea in Hulse's mind that it was a part of the proper preparation of the automobiles and of their work, undertook to drain the gasoline, it would seem that the Warehouse Company could not escape liability for their negligence in so doing, on the ground that they were acting outside the scope of their employment. If they were seeking, in the line of their employment, to accomplish their master's work, then the rule of *respondeat superior* applies, even though

the particular act was not ordered by the master, or not intended by the master to be done. [Whiteacre v. Chicago, etc., R. Co., 252 Mo. 438, 458.] And this is true even though in doing the work the men may have also had in mind the intention to sell the gasoline and appropriate the proceeds to their own use. [Hellriegel v. Dunham, 192 Mo. App. 43; Fellhauer v. Quincy, etc., R. Co., 191 Mo. App. 137; Chandler v. Gloyd, 217 Mo. 394.] Before we can interfere with the jury's finding we must hold that conclusively the men were not endeavoring to do the work of the master, but that, after working hours and after they had ceased the performance of their duties to their master, they returned to the car to steal the gasoline. If that were the fact, it is hardly reasonable that the master would have retained them in its service, but the record discloses that they still are in its employ. Under all the evidence, there was room for the jury to find that in removing the gasoline the men were seeking to accomplish their master's work and were acting within the scope of their employment. [Barnes v. Missouri, etc., R. Co., 192 S. W. 1040; Green v. Standard Oil Co., 199 S. W., 746; Hinkle v. Chicago, etc., R. Co., 199 S. W., 227.]

The petition does not wholly fail to state a cause of action for, as it was finally amended, it did state that the draining of the gasoline was necessary to prepare the automobile for shipment and the other allegations of the petition are sufficient to at least imply that such was the duty of the Warehouse Company who had received the automobile for the purpose of forwarding it. The petition was sufficient. [Fleishman v. Polar Wave Fuel Co., 163 Mo. App. 416, 420-421; Maniaci v. Interurban Express Co., 266 Mo. 633, 642-643.]

The point that the original petition alleged that the property was delivered by the Warehouse Company to the railway company and said petition being offered in evidence by the defendant, constituted a conclusive admission against interest and defeats plaintiff's right to

recover, is answered by what we have said in reference to the immateriality of where or in whose possession the goods were, if the defendant's negligence destroyed them.

The lantern was an ordinary switchman's lantern in which there was easy access of the fumes or vapor from the gasoline to the flame in the lantern, and there was no other fire or cause for the blaze in the car except the lantern. In view of these facts, and of the well-known nature of gasoline, when opened in an enclosed space like this car, to volatilize and give off fumes or gas which, upon spreading to a flame, will ignite and set fire to the whole, there can be no merit in the contention that there is no evidence to show the cause of the fire or that it was caused by the lighted lantern. The jury were amply justified in finding that the lantern was the cause of the fire. [Brown v. Freeman, 84 N. J. L. 360.] The inflammable and volatile nature of gasoline whereby its vapor is given off under these circumstances and the tendency of the latter to spread to a nearby open flame and ignite, are matters of such common knowledge that any ordinary mind should apprehend the danger, and surely the jury could reasonably find it was negligent to bring a lighted lantern into the car and drain the gasoline in such close proximity to it. [Van Bibber v. Swift & Co., 228 S. W. 69, 77; Bryan v. United, etc., Lamp Co., 176 Mo. App. 716; King v. National Oil Co., 81 Mo. App. 155, 165; Grigsby v. Bratton, 163 S. W. 804.]

The fact that plaintiff had insurance on his automobile and collected it does not affect the question of defendant's liability. [Erhart v. Wabash R. Co., 136 Mo. App. 617; Matthews v. Pacific R. Co., 142 Mo. 645, 659.]

The judgment is affirmed. All concur.